IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

WAJIH SHALATI,
    Plaintiff,

v.                                                      Civil No. 3:20cv211 (DJN)

CALLISTO INTEGRATION, INC.,
    Defendant.

**MEMORANDUM OPINION**
**(Granting Summary Judgment)**

Plaintiff Wajih Shalati ("Plaintiff") brings this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, against Callisto Integration, Inc. ("Defendant"), alleging that Defendant's decision to terminate Plaintiff's employment constituted unlawful race, national origin and religious discrimination. This matter comes before the Court on Defendant's Motion for Summary Judgment (ECF No. 14), moving the Court to grant summary judgment to Defendant on the grounds that Plaintiff has not established a prima facie case of employment discrimination. For the reasons set forth below, the Court hereby GRANTS Defendant's Motion (ECF No. 14), and DISMISSES WITH PREJUDICE Plaintiff's Complaint (ECF No. 1).

## I.    BACKGROUND

For purposes of background only, the Court recites the basic allegations in Plaintiff's Complaint.

### A.    Plaintiff's Allegations

Plaintiff filed his Complaint against Defendant on March 27, 2020. (Compl. (ECF No. 1).) Plaintiff, an Arab male of Jordanian national origin who practices Islam, alleges that Defendant unlawfully discriminated against him in violation of Title VII. (Compl. ¶¶ 1, 20-25.)

Defendant is a computer engineering firm that employed Plaintiff as a Programmer Analyst from December 11, 2017, until Plaintiff's termination on May 3, 2019. (Compl. ¶ 8, 18.) During this time, Plaintiff principally worked the helpdesk for Altria, a cigarette plant representing one of Defendant's most important clients. (Compl. ¶ 2.)

In January 2018, Plaintiff asked his direct supervisor, Jamie Boulanger ("Boulanger"), if Plaintiff could take extended lunches on Fridays, so that he could attend religious prayer services during the Muslim Sabbath. (Compl. ¶ 9.) Boulanger indicated that Plaintiff could generally do so (depending on the workload), but also asked Plaintiff what religion he practiced. (Compl. ¶ 9.) Plaintiff replied that he practiced Islam. (Compl. ¶ 9.) Shortly thereafter, Boulanger began making a series of jokes and sarcastic remarks directed at Plaintiff and his Muslim religion, with those comments increasing in frequency and severity over time. (Compl. ¶ 10.) Plaintiff eventually became aware that Boulanger often labeled Plaintiff as "anti-social" whenever he did not join Boulanger during lunch or other events. (Compl. ¶ 11.) Boulanger's conduct alienated Plaintiff, such that Boulanger often ignored Plaintiff's requests for work-related assistance despite quickly responding to other employees. (Compl. ¶ 12.)

In December 2018, Boulanger issued Plaintiff a "devastating 12-month evaluation." (Compl. ¶ 16.) In response, Plaintiff produced a report to his second-line supervisor, Joe Silva ("Silva"), showing that Plaintiff had, among other things, closed 1300 support tickets in the prior ten months. (Compl. ¶ 16.)

Meanwhile, Silva encouraged Jennifer Hiltz ("Hiltz"), one of Defendant's managers, to include Plaintiff on one of Hiltz's projects. (Compl. ¶ 17.) Hiltz declined, expressing her view that Plaintiff qualified as a "B-player" who would not survive. (Compl. ¶ 17.) Plaintiff alleges that Hiltz "derived this negative opinion [of Plaintiff's] skills from Boulanger's unjustifiably

2

poor evaluation." (Compl. ¶ 17.) Ultimately, on May 3, 2019, Defendant terminated Plaintiff's employment. (Compl. ¶ 18.) Plaintiff claims that the termination "was motivated by Boulanger's animus against [Plaintiff's] Arab race, Jordanian national origin and his Muslim religion." (Compl. ¶ 17.)

From these allegations, Plaintiff asserts claims for race discrimination (Count I), national origin discrimination (Count II) and religious discrimination (Count III). (Compl. ¶¶ 20-25.)

### B. Defendant's Motion for Summary Judgment

On January 26, 2021, Defendant filed its Motion for Summary Judgment (ECF No. 14). In support of its Motion, Defendant argues that Plaintiff has failed to establish a prima facie case for unlawful employment discrimination. (Def.'s Mem. in Supp. of Mot. Summ. J. ("Def.'s Mem.") (ECF No. 15) at 12-21.) Specifically, Defendant contends that Plaintiff cannot prove two of the four elements essential to his claims — i.e., that he performed his job satisfactorily and that similarly situated persons outside of the protected class received more favorable treatment. (Def.'s Mem. at 14.) As for the first element, Defendant submits that Plaintiff improperly stayed logged onto Altria's confidential and proprietary database; that he improperly used an "awaiting user info" function; and, that he did not resolve tickets in a timely manner. (Def.'s Mem. at 14.) Further, Defendant emphasizes an e-mail from Keri Wright ("Wright"), an Altria employee, in which Wright complained about Plaintiff's use of the "awaiting user info" function. (Def.'s Mem. at 15.) Defendant submits that Plaintiff lost his job, because Plaintiff's poor work performance necessitated his removal from the Altria account and Defendant simply had no other work for Plaintiff to perform. (Def.'s Mem. at 15.)

Additionally, Defendant attacks the causation prong of Plaintiff's claims. (Def.'s Mem. at 16-19.) On this score, Defendant argues that it also terminated a white employee for lack of

3

work. (Def.'s Mem. at 16.) Moreover, Defendant maintains that Silva — not Boulanger — decided to terminate Plaintiff. (Def.'s Mem. at 16, 20.) And, Defendant points out, Plaintiff does not allege any facts showing discrimination by Silva. (Def.'s Mem. at 16.) Given as much, Defendant reasons that Plaintiff cannot show that a discriminatory purpose animated its decision to terminate Plaintiff's employment. (Def.'s Mem. at 16, 20.)

On February 23, 2021, Plaintiff filed his Memorandum in Opposition to Defendant's Motion for Summary Judgment, (Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Resp.") (ECF No. 18)), and, on March 2, 2021, Defendant filed its Reply, (Reply Br. in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Reply") (ECF No. 19)), rendering the matter now ripe for review.

## II. STANDARD OF REVIEW

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant inquiry in a summary judgment analysis focuses on "whether the evidence presents a sufficient disagreement to require submission to a [factfinder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). In reviewing a motion for summary judgment, the Court must view the facts in the light most favorable to the non-moving party. *Id.* at 255. Moreover, the Court cannot weigh the evidence to enter a judgment, but simply must determine whether a genuine issue for trial exists. *Greater Balt. Ctr. for Pregnancy Concerns v. Mayor of Baltimore*, 721 F.3d 264, 283 (4th Cir. 2013).

Once the moving party properly submits and supports a motion for summary judgment, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec.*

4

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; instead, there must be no genuine issue of material fact. *Anderson*, 477 U.S. at 247-48. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

### III. ANALYSIS

The parties diverge in how they characterize the circumstances undergirding Defendant's argument that Plaintiff did not satisfactorily perform his job. (*Compare* Def.'s Mem. at 14-15 *with* Pl.'s Resp. at 11-13 (disputing whether Boulanger adequately trained Plaintiff, whether Plaintiff overused the "awaiting user info" function, whether Wright had a basis to complain about it and whether Plaintiff bore responsibility for Altria's dissatisfaction with Defendant).) However, because the Court holds that Plaintiff has clearly failed to show the causation element of his claims, the Court need not engage in an exhaustive analysis of these disputes or their impact on the instant Motion. Accordingly, the Court cabins its analysis to whether Plaintiff has presented a genuine dispute of material fact respecting the causation, or nexus, requirement of his Title VII claims.

#### A. Factual Background

For purposes of deciding the instant Motion, the Court recites the relevant portions of the evidentiary record. Except as otherwise indicated, the parties do not dispute the facts stated below.

In December 2017, Boulanger and Silva interviewed Plaintiff for the position of programmer analyst and, soon thereafter, Plaintiff signed an employment letter with the company. (Ex. 1 to Def.'s Mem. ("Pl.'s Dep.") (ECF No. 15-1) at 17; Ex. 2 to Def.'s Mem.

("Employment Letter") (ECF No. 15-2).) Plaintiff reported to Boulanger and Boulanger reported to Silva. (Pl.'s Dep. at 17.) Plaintiff primarily worked the helpdesk servicing Altria, one of Defendant's important clients. (Pl.'s Dep. at 22-24, 37.) As part of his job duties, Plaintiff would address "tickets," which represented computer problems reported by Altria employees. (Pl.'s Dep. at 27-28, 37-38.)

Shortly after Defendant hired Plaintiff, Plaintiff asked Boulanger for a religious accommodation in the form of extended Friday lunches. (Pl.'s Dep. at 65-68; Ex. A to Pl.'s Resp. ("Pl.'s Decl.") (ECF No. 18-1) ¶ 15.) The extra time would allow Plaintiff to attend religious prayer services during the Muslim Sabbath. (Pl.'s Dep. at 65-68; Pl.'s Decl. ¶ 15.) Boulanger checked with the manager, Craig Callan, and Plaintiff's request for extended lunches was approved. (Pl.'s Dep. at 66.)

Subsequent to that request, Boulanger began making a series of jokes and sarcastic remarks about Plaintiff and his Muslim religion. (Pl.'s Decl. ¶ 16.) The remarks increased in frequency and severity, with Boulanger directing demeaning jokes towards Plaintiff in the presence of his co-workers. (Pl.'s Decl. ¶ 16.) When Plaintiff did not attend certain events, Boulanger labeled him as "anti-social" and linked Plaintiff's decision not to attend the events with his Muslim religion. (Pl.'s Decl. ¶ 17.) Although Defendant insists that calling Plaintiff "anti-social" does not inherently relate to the Muslim religion, Defendant does not dispute that Boulanger made the comments. (Def.'s Mem. at 20-21.) In addition to these remarks, Plaintiff claims that Boulanger refused to assist or mentor Plaintiff during his time at the company. (Pl.'s Decl. ¶¶ 16-20.)

In December 2018, Plaintiff received a twelve-month performance evaluation. (Pl.'s Dep. at 161, 164-65; Pl.'s Decl. ¶ 30.) According to Plaintiff, Boulanger's input proved

6

"devastating," with Boulanger claiming that Plaintiff "had done nothing for the prior six months." (Pl.'s Decl. ¶ 30.) However, Defendant maintains that the evaluation itself does not have a negative or unsatisfactory overall rating and points to Plaintiff's failure to recall specific details about the evaluation. (Def.'s Mem. at 7 (citing Pl.'s Dep. at 171-73); Ex. 8 to Def.'s Mem. ("Performance Evaluation") (ECF No. 15-8) at 6-19.)

Also in December 2018, Altria announced that it would not renew its service contract with Defendant. (Pl.'s Decl. ¶ 34.) Accordingly, Defendant began transferring employees whom it had assigned to the Altria contract to other projects within the company. (Pl.'s Decl. ¶ 34.)

Around this same time, Silva removed Plaintiff from the Altria helpdesk and enrolled him in several different training programs with the expectation that Plaintiff could then perform other work for Defendant. (Pl.'s Dep. at 174-79.) Unfortunately, however, in February 2019, Silva asked Plaintiff to return to the helpdesk, given that the company had no other work to assign Plaintiff. (Pl.'s Dep. at 183-84.) Silva explained to Plaintiff that he could either work at the helpdesk or risk a layoff given the lack of other work. (Pl.'s Dep. at 183-84.) Plaintiff took the weekend to think it over, but ultimately decided to return to the helpdesk. (Pl.'s Dep. at 184-85.)

According to Defendant, on April 30, 2019, Wright sent an email to Silva complaining that Plaintiff improperly used the "awaiting user info" function. (Ex. 8 to Def.'s Mem. ("Silva's Decl.") (ECF No. 15-1) ¶ 13; Ex. 8 to Def.'s Mem. ("Wright Email") (ECF No. 15-1) at 21.) Specifically, Wright complained that Plaintiff would designate a ticket as "awaiting user info," despite the fact that Plaintiff could actually resolve the ticket without additional information from Altria. (Silva's Decl. ¶ 13; Wright Email at 21.) As a result, Altria requested that Defendant remove Plaintiff from the helpdesk. (Silva Decl. ¶ 16.)

7

On the other hand, Plaintiff contends that the Court cannot consider the Wright Email, urging that it constitutes inadmissible hearsay. (Pl.'s Resp. at 5, 12-13.) In any event, Plaintiff claims that he never worked with Wright and that Wright complained about an event with which Plaintiff had no involvement. (Pl.'s Decl. ¶ 14.) Additionally, Plaintiff emphasizes that Altria had already terminated its helpdesk contract with Defendant as of December 2018, thus negating the likelihood that Plaintiff represented the source of Altria's dissatisfaction with Defendant. (Pl.'s Decl. ¶ 34.)

Ultimately, on May 3, 2019, Defendant terminated Plaintiff's employment. (Pl.'s Dep. at 227.) Defendant asserts that Plaintiff's termination resulted from his removal from the Altria account in conjunction with the absence of other work for Plaintiff to perform within the company. (Silva Decl. ¶ 16.) In this vein, Defendant highlights an email exchange between Silva and Hiltz in which Silva asks Hiltz to include Plaintiff on a project team. (Ex. 2 to Def.'s Reply ("Hiltz Email") (ECF No. 19-2) at 5-6.) In response, Hiltz states that she "do[es] not currently have an active project for [Plaintiff]." (Hiltz Email at 5.) Hiltz continues, "I would say it may make sense to part ways if support is not working for him and his true desire is to be a developer? If he seems like a solid A/rockstar person, then let's keep him and he will quickly fit into a new team, however, if he is a b player, then I am not sure he will survive." (Hiltz Email at 5.) In light of these dynamics, Defendant maintains that Silva and Craig Broughton, another executive, made the decision to terminate Plaintiff's employment. (Silva Decl. ¶ 16.) Silva declares that Boulanger did not participate in the decision. (Silva. Decl. ¶ 16.)

Plaintiff characterizes his termination differently. According to him, Boulanger's "unfair and unjustified negative assessment" of Plaintiff's work performance influenced other managers, like Hiltz. (Pl.'s Decl. ¶¶ 34-35.) In Plaintiff's telling, Hiltz called him a "B-player" as a result

8

of Boulanger's poor evaluation of Plaintiff in the 2018 annual performance review.[1] (Pl.'s Decl. ¶ 35.)

Notwithstanding his allegations against Boulanger, Plaintiff admits that he viewed Silva as a good man and that he appreciated Silva's efforts to get Plaintiff another job within the company. (Def.'s Mem. at 10; Pl's Resp. at 6; Pl.'s Dep. at 16-17.) Indeed, Plaintiff "acknowledges that no one besides Boulanger discriminated against him." (Pl.'s Resp. at 4.) Plaintiff further admits that Defendant also terminated a white employee for lack of work. (Pl.'s Dep. at 229.)

### B. The Undisputed Facts Show That Plaintiff Cannot Establish That A Discriminatory Purpose Motivated His Termination.

As mentioned, Defendant argues that Plaintiff's claims fail, because Boulanger did not participate in the decision to terminate Plaintiff's employment. (Def.'s Reply at 2-4.) Defendant emphasizes that Silva — not Boulanger — terminated Plaintiff's employment and only did so after his efforts to find Plaintiff other work failed. (Def.'s Reply at 2.) Conversely, Plaintiff contends that Boulanger's "disparagement of [Plaintiff's] work performance sabotaged any possibility of other Callisto managers hiring [Plaintiff], including a team led by [Hiltz]." (Pl.'s Resp. at 6; 15.) According to Plaintiff, "*[i]t had to have been* Boulanger's false and unjustified assessment of [Plaintiff] that poisoned Hiltz's view of him." (Pl.'s Resp. at 6 (emphasis added).) The Court agrees with Defendant.

---

[1] Notably, Plaintiff mischaracterizes the Hiltz Email. Indeed, Hiltz never called Plaintiff a "B player," but simply indicated that "if he is a b player" he would not survive. (Hiltz Email at 5.)

9

*1.     Plaintiff has not demonstrated through direct or circumstantial evidence that a discriminatory purpose motivated his termination.*

Title VII makes it unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race . . . religion . . . or national origin." 42 U.S.C. § 2000e-2(a)(1). "A plaintiff can establish a Title VII [ ] discrimination claim one of two ways." *Rayyan v. Virginia DOT*, 719 F. App'x 198, 201 (4th Cir. 2018). First, a plaintiff can demonstrate "through direct or circumstantial evidence that his race was a motivating factor in the employer's adverse employment action." *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007). Alternatively, a plaintiff can establish an inferential case under the burden-shifting framework enunciated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-07 (1973).[2]

To survive summary judgment under the first rubric, a plaintiff "must produce direct evidence of a stated purpose to discriminate and/or indirect evidence of sufficient probative force to reflect a genuine issue of material fact." *Rayyan*, 719 F. App'x at 202 (quoting *Goldberg v. B. Green & Co., Inc.*, 836 F.2d 845, 848 (4th Cir. 1988)). In essence, "the plaintiff 'must produce evidence that clearly indicates a discriminatory attitude at the workplace and must illustrate a nexus between that negative attitude and the employment action.'" *Id.* (citing *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 608 (4th Cir. 1999), *abrogated on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101-02 (2003)). Relevant here, derogatory statements

---

[2]     Courts recognize two genres of religious discrimination claims: (1) disparate treatment; and, (2) failure to accommodate. *Chalmers v. Tulon Co.*, 101 F.3d 1012, 1017 (4th Cir. 1996). The evidentiary burdens under a disparate treatment theory "mirror those placed" on a plaintiff asserting other types of discrimination, such as race or national origin. *Id.* Accordingly, because Plaintiff advances a disparate treatment claim here, the Court evaluates all three of his claims under the same analytical framework. (Pl.'s Resp. at 17-19.)

can constitute direct evidence of discrimination, but such statements must be "related to the employment decision in question." *Id.* (citations omitted). As such, if the remarks "lack a nexus connecting them to [the plaintiff's] dismissal," they cannot constitute evidence of discrimination. *Id.*

In *Brinkley*, the former general manager ("plaintiff") of a country club ("HRC" or the "club") brought a sex discrimination suit against the club following her termination and the subsequent hiring of a man to replace her. 180 F.3d at 602-03. Before the club had voted to promote the plaintiff to the position of general manager, the superintendent stated that he "wasn't sure he could work for a woman." *Id.* at 603-04. During the plaintiff's tenure as the general manager, the relationship between she and the golf instructor deteriorated, such that the plaintiff refused to work with him. *Id.* at 604. Thereafter, the club, not wanting a division in management, decided not to renew the plaintiff's contract for the general manager position. *Id.*

In affirming the district court's grant of summary judgment to HRC, the Fourth Circuit held that the plaintiff did not "illustrate a nexus between" a discriminatory attitude at the workplace and the challenged employment action. *Id.* at 608. Specifically, the court analyzed and found insufficient the superintendent's derogatory remark about working for a woman. *Id.* at 607. En route to affirming summary judgment, the court observed that although "[d]erogatory remarks may in some instances constitute direct evidence of discrimination," "Title VII was not designed to create a federal remedy for all offensive language . . . in the workplace." *Id.* at 608 (quoting *Hopkins v. Baltimore Gas & Elec.*, 77 F.3d 745, 754 (4th Cir. 1996)). Ultimately, because the club promoted the plaintiff subsequent to the remark, the remark did not constitute probative evidence of discriminatory animus. *Id.*

11

Here, Plaintiff relies on Boulanger's remarks as evidence of direct discrimination. Yet, those remarks began soon after Plaintiff commenced employment with Defendant, and well before Silva made efforts to find Plaintiff other work in the company. And, as mentioned above, Plaintiff maintains no discrimination allegations against anyone other than Boulanger. Accordingly, Plaintiff must show a nexus between Boulanger's discriminatory remarks and the unwillingness of other managers within the company to accept Plaintiff onto another team.

To that end, Plaintiff posits that Boulanger represents the only manager "who could have" "poisoned" Plaintiff's standing with others in the company. (Pl.'s Resp. at 15.) But Plaintiff's argument amounts to nothing more than mere conjecture. Indeed, Plaintiff relies entirely on the notion that Boulanger's discriminatory remarks tarnished Plaintiff's reputation with other managers, who in turn then refused to offer him a lifeline as the Altria contract ended. Yet, the record does not provide any evidentiary support for that argument. For instance, no other employee (including Hiltz) testified that Boulanger's remarks influenced the decision to dismiss Plaintiff. And, in her email to Silva, Hiltz makes no mention whatsoever of Boulanger — let alone of the discriminatory remarks alleged in this case.[3] (Hiltz Email at 5.) In fact, Plaintiff provides no evidence that another manager (except Silva) even heard or knew of Boulanger's discriminatory remarks.[4] In short, Plaintiff offers only his own speculation that

---

[3] Plaintiff does not attack the Hiltz Email as constituting inadmissible hearsay (unlike the Wright Email, which he contends does represent hearsay). In any event, the Court accepts the Hiltz Email for purposes of showing what Hiltz *did not* communicate — i.e., that a discriminatory purpose underlay her decision not to offer Plaintiff a position. Accordingly, the Hiltz Email does not qualify as a "statement" within the meaning of Federal Rule of Evidence 801(a).

[4] Plaintiff does attach a declaration from a co-worker in which the co-worker attests to hearing Boulanger make derogatory remarks toward both he and Plaintiff. (Ex. 2 to Pl.'s Resp. (ECF No. 18-2) ("Apau-Boteng Decl.") at 1-3.) However, the co-worker averred that he only communicated that information to Silva (who Plaintiff does not argue discriminated against

Boulanger "had to have been" or represented the only one "who could have" extinguished Plaintiff's opportunity to find other work in the company. (Pl.'s Resp. at 6; 15.)

But Plaintiff does not have first-hand knowledge of that allegation. *See* Fed. R. Evid. 602 (requiring lay witnesses to base their testimony on personal knowledge); Fed. R. Civ. P. 56(c)(4) (requiring affidavits and declarations to be based on personal knowledge when used to support or oppose a motion for summary judgment); *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, (4th Cir. 1996) ("Because . . . we generally consider self-serving opinions without objective corroboration not significantly probative, the decision to strike and disregard as irrelevant [the plaintiff's] assertions was not improper."). Accordingly, Plaintiff's speculation as to the mindset of Defendant's managers (including Hiltz) does not represent competent evidence sufficient to create a genuine dispute of material fact.[5]

In short, the evidence overwhelmingly shows that Defendant dismissed Plaintiff, because the company simply did not have other work for him to perform in the aftermath of his removal from the Altria helpdesk.[6] And, because Plaintiff cannot illustrate a nexus between Boulanger's discriminatory remarks and his termination, he has not demonstrated direct or indirect evidence of employment discrimination.

---

him), and that Silva "did not escalate [the] complaint to higher management or human resources." (Apau-Boteng Decl. ¶ 10.) Accordingly, the declaration does not advance Plaintiff's argument that other managers refused to hire him, because of Boulanger's discriminatory attitude.

[5] Specifically, the Court ignores Paragraphs 34, 35 and 37 of Plaintiff's declaration to the extent that they opine that Boulanger influenced other managers not to hire Plaintiff. Those opinions do not satisfy Rule 56(c)(4).

[6] The Court considers the Wright Email only to the extent that it shows the effect on the listener — i.e., Silva. Otherwise stated, the importance of the Wright Email is not the truth of what it asserted. Rather, its relevance here stems from the effect that it had on Silva; namely, his decision to remove Plaintiff from the helpdesk.

> 2. *Plaintiff fails to establish a prima facie case under the McDonnell Douglas burden-shifting scheme.*

Finally, Plaintiff also fails to establish an inferential case of unlawful employment discrimination. A plaintiff can establish a prima facie showing of discrimination by demonstrating: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and, (4) that similarly-situated employees outside the protected class received more favorable treatment. *Rayyan*, 719 F. App'x at 203; *McDonnell Douglas*, 411 U.S. at 802. If the plaintiff presents a prima facie case, the burden of production shifts to the employer to articulate a legitimate reason for the adverse action. *Id.* at 204. If the employer meets its burden, the plaintiff must then show that the proffered reasons constituted a pretext for discrimination. *Id.*

Here, Plaintiff fails to establish the fourth element of his prima facie case — that similarly-situated employees outside the protected class received more favorable treatment. Indeed, Plaintiff summarily posits that he "was the only Muslim on [the] Callisto team working under Boulanger. He and other team members interviewed to be transferred to other Callisto departments, including [Hiltz's] department, but of those who interviewed only [Plaintiff] was not hired." (Pl.'s Resp. at 17-18.) Notwithstanding this argument, Plaintiff does not present a modicum of evidence relating to the characteristics of these other team members — to include their relative degrees of experience performing certain jobs, their seniority in the company, their levels of education or training, or their performance quality while working for Defendant. *See Brinkley*, 180 F.3d at 610-11 (rejecting the plaintiff's argument that her male replacement was similarly situated, when in fact the replacement's qualifications exceeded the plaintiff's); *see also Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010) (a plaintiff must show that he is "similar in all relevant aspects" to his comparator). Simply put, Plaintiff has not shown that

14

another employee, outside of his protected class and who shared similar credentials, received more favorable treatment from Defendant. To the contrary, Plaintiff admits that Defendant also terminated a white employee for lack of work. (Def.'s Mem. at 10; Pl.'s Resp. at 7; Pl.'s Dep. at 229.)

Accordingly, Plaintiff has not created a genuine dispute of material fact as to the viability of his employment discrimination claims.

## IV. CONCLUSION

For the reasons set forth above, the Court GRANTS Defendant's Motion for Summary Judgment (ECF No. 14) and DISMISSES WITH PREJUDICE Plaintiff's Complaint (ECF No. 1).

An appropriate Order shall issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record.

_____/s/_____
David J. Novak
United States District Judge

Richmond, Virginia
Date: June 3, 2021